UNITED STATES

v.

Greg S. THATCHER, 310 54 3811, Private (E–1), U.S. Marine Corps.

NMCM 85 3448.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 8 April 1985.

Decided 31 Jan. 1986.

LTCOL Richard E. Ouellette, USMC, Appellate Defense Counsel.

LT Robert G. Sosnowski, JAGC, USNR, Appellate Government Counsel.

Before KERCHEVAL, Senior Judge, and RAPP and GRANT, JJ.

GRANT, Judge:

The appellant was convicted at a special court-martial of stealing the property of a Marine sergeant, corporal and lance corporal, in violation of Article 121, Uniform Code of Military Justice, and sentenced to confinement for four months, forfeitures of $400.00 pay per month for four months, and a bad conduct discharge. The convening authority approved the sentence as adjudged, and the appellant assigns as error the trial judge's failure to suppress evidence of the stolen property seized in a search of the appellant's barracks room during the course of a purported health and welfare inspection, which appellant alleges was a subterfuge for a criminal investigation in violation of Military Rule of Evidence (Mil.R.Evid.) 313(b).

## SUMMARY OF EVIDENCE

Corporal C, the Company Police Sergeant, testified that on Friday, 25 January 1985 there was a gray metal tool box containing assorted tools, the property of Sergeant C, in the police shed, together with a green Army first aid kit, containing his own assorted tools, and a green metal trunk (with a "The Who" sticker on the side), the property of Lance Corporal B. Corporal C discovered the property missing upon returning to the police shed on Monday morning, 28 January 1985, and reported the missing property to Gunnery Sergeant McK, the Company Gunnery Sergeant, after first searching throughout the common areas in the barracks. Gunnery Sergeant McK's initial reaction was that the property had been misplaced. Major T, the Company Commander, joined the conversation and, also believing the property had been misplaced, directed that a further search be conducted. Gunnery Sergeant

McK and Corporal C again checked the police shed but to no avail, and advised Major T they could not locate the property or any record of the property having been logged out. Major T opined that a person assigned to a working party the previous week probably had checked out the property from the police shed and had left the property in a working area or in their room, noting that property had been taken before from the police shed without being properly logged out. Major T had no knowledge of the property's location, or the identity of the person who took the property, or whether the property had been stolen, although he admitted having grimaced upon learning that the appellant was on the working party at the time the property was discovered missing and that the appellant's name usually came up whenever anything negative occurred in the company area. Major T remembered the appellant's name being mentioned during the conversation, because it was later determined that the property was in his room and because he remembered thinking at the time, "We need to check in his room quickly so that ... he can go ahead and get discharged," as the appellant was scheduled to be discharged the following day. In regard to Lance Corporal B's green metal trunk, Major T advised Corporal C to check with another Marine who owned a trunk identical to Lance Corporal B's to determine if there had been a mix-up.

Major T instructed Gunnery Sergeant McK and Corporal C to track down personnel on the working party to find out "if they'd signed the tool boxes out to anybody or if they still had them" and to see if the tool boxes were in their rooms. Although Major T did not formally advise Gunnery Sergeant McK to check the rooms of persons on the working party in connection with the daily health and welfare inspection, he intended it to be part of the inspection since they were "going to be walking through anyway," inspecting for cleanliness and ensuring that pilferable items were secured in the wall lockers. Major T did not provide specific guidance to Gunnery Sergeant McK and Corporal C in regard to how the inspection was to be executed, but merely advised them to check the rooms. However, Gunnery Sergeant McK was never authorized as part of his daily inspections to indiscriminately search through wall lockers or break into wall lockers that were secured. Only in instances where a wall locker was found unlocked was Gunnery Sergeant McK permitted to look inside the wall locker and only for the purpose of identifying to whom it belonged.

Gunnery Sergeant McK and Corporal C proceeded directly to the appellant's barracks room, and upon entering the room after allegedly knocking and not receiving a response, found the appellant standing beside his open wall locker, packing his seabag with the contents of his wall locker in anticipation of being discharged the following day. Gunnery Sergeant McK in the course of conducting his regular health and welfare inspection advised the appellant he was looking for missing tools. However, after Corporal C spotted Lance Corporal B's green metal trunk with the "The Who" sticker on the side located inside the appellant's open wall locker and in plain view and so advised Gunnery Sergeant McK, the appellant was directed by Gunnery Sergeant McK to remove the green trunk from his wall locker and to further remove the contents thereof. The gray metal tool box and tools, belonging to Sergeant C, and the green Army first aid kit containing the tools of Corporal C were discovered inside the trunk.

## I

The resolution of the certified issue requires an analysis of Mil.R.Evid. 313(b),[1]

---

1. Rule 313. Inspections and inventories in the armed forces

(a) *General rule.* Evidence obtained from inspections and inventories in the armed forces conducted in accordance with this rule is admissible at trial when relevant and not otherwise inadmissible under these rules.

(b) *Inspections.* An "inspection" is an examination of the whole or part of a unit ... conducted as an incident of command the primary purpose of which is to determine and to ensure

which upholds the authority of the commander to conduct health and welfare inspections and to seize evidence in the course of such inspections, including weapons and contraband, "when safeguards are present which assure that the 'inspection' was really intended to determine and assure the readiness of the unit inspected, rather than merely to provide a subterfuge for avoiding limitations that apply to a search and seizure in a criminal investigation." *United States v. Middleton,* 10 M.J. 123, 132 (C.M.A.1981). *Middleton* sets forth the basic standard applicable to health and welfare inspections, although the case was not decided under the most recent version of the rule. Echoing the *Middleton* rationale, Mil.R.Evid. 313(b), in its present form, specifically prohibits any health and welfare inspection conducted primarily for the purpose of obtaining evidence for use at a court-martial or other disciplinary proceedings, although an inspection conducted to ensure security, military fitness, and good order and discipline does not become an unlawful search for evidence merely by including within the scope of the inspection an examination to locate and confiscate weapons and other contraband. However, certain circumstances enumerated, as described in footnote 1, *supra,* attendant to any examination for weapons and other contraband will raise a strong likelihood that the inspection was a subterfuge for a criminal investigation, requiring the Government to prove by clear and convincing evidence that the purpose of the inspection was within the meaning of the rule.

■ Applying the evidentiary rule and the *Middleton* rationale to the present case, we conclude that the search of appellant's room for the missing property was part of a legitimate health and welfare inspection, where the commander did not suspect the property had been stolen, did not order the examination of appellant's room for the primary purpose of obtaining evidence for use at a court-martial or other disciplinary proceedings, and the search for the missing property was part of a daily health and welfare inspection conducted by the company gunnery sergeant. Furthermore, as the purpose of the inspection was not to locate weapons or contraband, the strong likelihood of subterfuge is absent, although the appellant's barracks room was singled out because he was a member of the working party suspected by the commander of having used the tools without checking them out and because he was going to be discharged the following day. Consequently, the Government was not required to demonstrate clearly and convincingly the legitimacy of the inspection, albeit we believe the proof supporting the legitimacy of the health and welfare inspection rises to such a level.

II

■ The remaining question is whether the seizure of the metal tool box and Army first aid kit containing assorted tools, located inside the trunk, was outside the scope of the health and welfare inspection, as the *Middleton* rationale does not permit indiscriminate intrusions into the privacy of personnel which are not proximately related to the legitimate interests of a commander in conducting a health and welfare inspection. *United States v. Brown,* 12 M.J. 420

the security, military fitness, or good order and discipline of the unit .... An inspection also includes an examination to locate and confiscate unlawful weapons or other contraband.... An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following

ing a report of a specified offense in the unit ... and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule.... Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.

**912**

(C.M.A. 1982). In the present case, Gunnery Sergeant McK admitted that at the moment he ordered the appellant to remove the trunk from his wall locker, he suspected the appellant of criminal conduct, and in fact, directed Corporal C to deliver the appellant to law enforcement officials, however, not before Corporal C observed the gray metal tool box and Army first aid kit containing the assorted tools as the appellant was emptying the trunk. Unlike the *Middleton* case, the commander in the present case authorized the inspecting personnel to look inside open wall lockers, and in particular, authorized the inspectors to search for specified missing property. Where part of the missing property, namely a green trunk, was discovered in plain view in an open wall locker belonging to the appellant, we believe that not only was the seizure of the trunk an authorized function of the inspection, but that the extension of the inspection into the contents of the trunk was a logical and reasonable evolution of the inspection process, under the circumstances, and implicitly within the scope of the commander's order to search the rooms of persons on the working party for the missing property in connection with the daily health and welfare inspection. We simply do not believe that focusing on the appellant as a suspect in the course of an inspection transformed an otherwise legitimate inspection into a search for evidence to use in a criminal prosecution or disciplinary proceedings where the actions of the inspectors were reasonably related to the scope of the inspection and the circumstances belie any reasonable expectation of privacy on the part of the appellant. *United States v. Grace,* 19 U.S.C.M.A. 409, 42 C.M.R. 11 (1970).

Accordingly, the findings of guilty and the sentence as approved on review below are affirmed.

Senior Judge KERCHEVAL and Judge RAPP, concur.